UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   25-mj-8684-RMM

IN RE SEALED COMPLAINT

_____/

FILED BY ___SP___ D.C.
Nov 18, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?   No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?   No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?   No

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:   /s/ Katie Wilson
KATIE WILSON
Assistant United States Attorney
Florida Bar No. 1026417
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 209-1043
Fax: (561) 805-9846
Katie.Sadlo@usdoj.gov

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>DWAYNE MCLEOD,<br><br><br>*Defendant(s)* | )<br>)<br>)   Case No.   25-mj-8684-RMM<br>)<br>)<br>) |

FILED BY ___SP___ D.C.
Nov 18, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   8/21/25, 8/28/25, 9/4/25, 10/2/25 & 10/29/25   in the county of   Palm Beach   in the
Southern   District of   Florida   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Distribution of Controlled Substance (Fentanyl) |

This criminal complaint is based on these facts:
Please see the attached affidavit of Special Agent Zachary Schleiffer, Federal Bureau of Investigation (FBI).

☑ Continued on the attached sheet.

*Complainant's signature*

Zachary Schleiffer, Special Agent, FBI
*Printed name and title*

Sworn to and attested to me by applicant by telephone (Facetime) per the requirements of Fed. R. Crim. P.4 (d) and 4.1.

Date: 11/18/25

*Judge's signature*

City and state:   West Palm Beach, FL         Ryon M. McCabe, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Zachary F. Schleiffer, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND JURISDICTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and I have been so employed since September 2021. I am currently assigned to PB-2, the Violent Crimes and Major Offender Squad of the Palm Beach County Resident Agency, which investigates bank robberies, narcotics trafficking, fugitives, firearms offenses, and other violent crimes.

2. Pursuant to 18 U.S.C. § 3052, I am authorized to apply for and execute search warrants and arrest warrants for offenses enumerated in Titles 18 and 21 of the United States Code. I have participated in and directed investigations involving violent crime, trafficking in controlled substances, and firearms offenses. As a result of my training and experience, I am familiar with the tactics, methods, and techniques of committing those crimes.

3. I make this affidavit in support of an application for a criminal complaint charging DWAYNE MCLEOD, hereinafter referred to as "MCLEOD," with violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C), Distribution of a Controlled Substance (Fentanyl).

4. This affidavit is based upon my own personal knowledge of the facts and circumstances surrounding the investigation and information provided to me by other law enforcement officers. I have not included in this affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause for the offense stated.

### PROBABLE CAUSE

5. In or about January 2025, the FBI and local law enforcement began a joint undercover operation investigating violent crime and narcotics violations in historically high-

1

crime areas within Riviera Beach, Florida, and West Palm Beach, Florida. Through that investigation, law enforcement learned of a potential distributor of fentanyl.

6. On or about August 13, 2025, an undercover law enforcement officer (UC) received a phone number for a "plug" for fentanyl. Based on my training and experience, I know that "plug" is slang for source for a controlled substance. That same day, the individual who provided the phone number for the "plug" told the UC to call the number so the individual could make the introduction. The UC subsequently called the phone number and spoke to an individual later identified as MCLEOD. During the call, MCLEOD advised that the UC could contact him the next time the UC needed to "score."

7. On August 21, 2025, law enforcement planned a controlled purchase with MCLEOD. The UC called MCLEOD and advised he/she was looking to purchase "300 worth." MCLEOD agreed to meet the UC in the Goodwill parking lot located at 3500 Broadway, Riviera Beach, FL. After the UC parked at the provided location, MCLEOD told the UC via a phone call to come to his car. The UC, who previously reviewed booking photos and other records tied to MCLEOD, positively identified the individual in the car as MCLEOD.

8. After the UC got into MCLEOD's car, MCLEOD offered the UC suspected crack cocaine. The UC told MCLEOD that he/she did not want to purchase "hard," which is slang for crack cocaine. MCLEOD told the UC that he did not have "hats" on him, which is a slang term for capsules of fentanyl, and that he would have to go to get them. The UC and MCLEOD subsequently departed to an unknown location.

9. After MCLEOD parked at an unknown shopping center that was next to a residential neighborhood, an unknown black male hopped a nearby fence, approached the vehicle, dropped a bag of suspected fentanyl in the UC's lap, and departed. The UC subsequently gave

2

$200 of U.S. currency to MCLEOD for the suspected fentanyl.

10. MCLEOD told the UC not to do any of the suspected fentanyl until he/she got home because it was strong. MCLEOD also told the UC that they will meet at the Goodwill parking lot from now on for future deals. MCLEOD further told the UC that he can be the "plug" for future deals and get the UC as much product as he needed. MCLEOD subsequently dropped the UC off at the Goodwill parking lot.

11. The purchased product was determined to weigh approximately five grams and was submitted for laboratory testing. One capsule of the purchased product was later tested by the Palm Beach County Sheriff's Office (PBSO) Laboratory and was confirmed to contain fentanyl.

12. On August 28, 2025, the UC called MCLEOD in an attempt to arrange a controlled purchase of fentanyl. During the call, MCLEOD agreed to sell the UC $300 worth of "hats." MCELOD instructed the UC to meet in the "usual spot," which the UC understood to mean the Goodwill parking lot.

13. Upon arrival at the Goodwill parking lot, MCLEOD was seen in his vehicle with an unknown female. The unknown female reached into MCLEOD's vehicle and walked to the UC's vehicle with 15 capsules of suspected fentanyl. The UC exchanged $300 for the capsules of suspected fentanyl. The unknown female then walked back to MCLEOD's vehicle and handed MCLEOD an unidentified item or items through the window.

14. Based on my training and experience, it is common for drug traffickers to use a "middle man" to conduct transactions like the one described above as an attempt to thwart law enforcement surveillance and/or to minimize the appearance that they were the source of the controlled substance.

15. The purchased product was determined to weigh approximately eight grams and

was submitted for laboratory testing. One capsule of the purchased product was later tested by the PBSO Laboratory and was confirmed to include fentanyl. The test of the capsule of purchased product also resulted in a tentative positive result for cocaine. Further testing is in progress to confirm the presence of cocaine.

16. On September 4, 2025, the UC called MCLEOD and asked for an additional $300 worth of product. The UC subsequently met with MCLEOD in the Goodwill parking lot and exchanged $300 for 18 capsules of suspected fentanyl. The purchased product was determined to weigh approximately eight grams and was submitted for laboratory testing. One capsule of the purchased product was later tested by the PSBO Laboratory and was confirmed to include fentanyl.

17. On October 2, 2025, the UC called MCLEOD and asked for an additional of $500 worth of product. That same day, the UC met with MCLEOD in the DD's Discount Footwear parking lot in Riviera Beach, FL. MCLEOD exited his vehicle and entered the UC's vehicle. The UC gave MCLEOD $500 in exchange for 26 capsules of suspected fentanyl. The purchased product was determined to weigh approximately 9 grams and was submitted for laboratory testing. One capsule of the purchased product was later tested by the PBSO Laboratory and was confirmed to include fentanyl.

18. On October 29, 2025, the UC called MCLEOD and requested $600 of "uncapped" or "regular" fentanyl. Based on my training and experience, "uncapped" or "regular" fentanyl refers to raw powdered fentanyl, rather than capsules of fentanyl.

19. MCLEOD agreed to the deal and met the UC in the parking lot of DD's Discount Footwear. MCLEOD entered the UC's vehicle and requested that the UC take a short drive around the parking lot. During that time, MCLEOD produced a bag containing white powder. In MCLEOD's presence, the UC weighed the powder and confirmed the total package weight to be

approximately 8.26 grams. The purchased product was later tested by the PBSO Laboratory and confirmed to include fentanyl.

## CONCLUSION

20. Based on the foregoing, I submit that probable cause exists to believe that on or about August 21, 2025, August 28, 2025, September 4, 2025, October 2, 2025, and October 29, 2025, DWAYNE MCLEOD committed the criminal offenses of Distribution of a Controlled Substance (Fentanyl), in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

## REQUEST FOR SEALING

21. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
Zachary F. Schleiffer, Special Agent
Federal Bureau of Investigation

Sworn and Attested to before me by Applicant by Telephone (Facetime) pursuant to Fed. R. Crim. P. 4(d) and 4.1 this __18__ day of November, 2025.

_____
RYON M. MCCABE
UNITED STATES MAGISTRATE JUDGE

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**:  DWAYNE MCLEOD

**Case No**:  25-mj-8684-RMM

Distribution of Controlled Substance (Fentanyl)

In violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C)
* **Max. Term of Imprisonment:** 20 years
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** 3 years to Life
* **Max. Fine:** $1,000,000

*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.